ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
|! This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, David J. Mitchell, an attorney licensed to practice law in Louisiana.
*308 UNDERLYING FACTS
From 1978 to 2008, respondent was an associate, then a partner, in the New Orleans office of the law firm of Porteous, Hainkel, Johnson & Sai’py (“the firm”), where his practice was principally confined to the defense of insurance companies. Given the nature of his practice, respondent billed for his legal work on an hourly basis, and these bills were paid to the firm by the client. In addition, respondent’s major client, Farm Bureau Insurance Company (“Farm Bureau”), allowed him to seek reimbursement for mileage and for out-of-pocket expenses (such as tolls and parking) in connection with his travel on Farm Bureau’s legal matters. Upon incurring such expenses, respondent submitted an expense reimbursement request form to the firm’s accounting department; in turn, he received a check from the firm and the firm then recouped these amounts from Farm Bureau.
Sometime in the late 1980’s or early 1990’s, the firm became aware that respondent was submitting expense reimbursement request forms without attaching the necessary documentation to support the claim. Additionally, respondent was routinely tardy in submitting his reimbursement requests, often after the client’s | gfile in question was closed, making it more difficult for the firm to recover the expenses from its client. As a result, respondent was confronted by firm management. Respondent excused his conduct as nothing more than “sloppy recordkeeping,” an explanation which the firm accepted at that time. Nevertheless, to resolve the concerns over his expense practices, the firm required and respondent agreed that in the future he would submit all of his expense reimbursement request forms to another partner for review, and that he would refrain from signing his own expense reimbursement checks. These procedures remained in place for the duration of respondent’s employment with the firm.
In May 2008, respondent submitted a request for reimbursement of mileage charges and other expenses which he claimed to have incurred in representing Farm Bureau in December 2007, January 2008, and February 2008. The firm’s managing partner, James Thompson, reviewed the request before it was approved for payment but felt in his experience that it was unlikely the claimed travel had actually taken place. Mr. Thompson then requested copies of several previous months of travel reimbursements which had already been paid to respondent, and upon reviewing them, he became concerned that the issues he identified on the May 2008 request were not just random errors.
After discussions with the firm’s executive committee, it was determined that an “audit committee” composed of Mr. Thompson, partner Fred M. Trowbridge, Jr., and a third partner would review respondent’s expense reimbursement requests covering a three-month period, with an attempt made to cross-reference the claimed travel to respondent’s calendars, billing records, and to the individual Farm Bureau files to which the expenses had been charged. After the audit committee discovered numerous irregularities in the limited audit, a similar but more comprehensive audit was then authorized of respondent’s expense reimbursement requests dating back to 2003. Following the audit of this five-year |3period, the audit committee identified 794 requests for reimbursement of $23,212 in expenses for events that were not on respondent’s calendar, could not be documented in a file, had not taken place due to a settlement or continuance, occurred when respondent was out of the office, or had been covered by someone else in the firm. In none of these instances was there any correspond *309 ing charge to the client for respondent’s time as a lawyer. The audit committee also discovered that respondent had continued to sign some of his own expense reimbursement checks, despite his agreement not to do so.[1]
After the audit committee completed its work, respondent was given time to review all of the documentation and the client files and prepare a response. The full partnership of the firm was then summoned to a meeting in New Orleans, and again respondent was permitted to respond. During the meeting, respondent maintained that he was simply a “sloppy bookkeeper” and that if he had made any mistakes on his expense reimbursement request forms he would “make it right” to his partners. However, the firm felt this explanation was very similar to that which respondent had given years before when the same problem surfaced. The firm immediately notified Farm Bureau of what had occurred and issued a check to the insurance company for $23,212 in restitution for the questionable expense reimbursements identified in the internal audit.
Following the partners’ meeting, all of the partners were afforded the opportunity to review the work of the audit committee, and it was agreed that the partners would reconvene at a later date to consider respondent’s future with the firm. Partner Kathleen Simon decided that to be fair to respondent, prior to making any decision in this regard she should personally review all of the ^documentation that the audit committee had reviewed, including the client files and bills and respondent’s calendar. Ms. Simon made several trips to New Orleans and spent a considerable amount of time cross-checking each of the expense items that had been flagged as questionable by the audit committee, along with the related source documents. Following her review, Ms. Simon came to the conclusion that over a five-year period, respondent had indeed submitted “hundreds and hundreds and hundreds” of expense reimbursement requests for events that never happened. Similarly, partner Adrianne Baumgartner reviewed all of the files and documents pertaining to the time period initially in question (the first three to five months) and performed a “spot check” of the documentation reviewed by the audit committee for the 2003-2008 time period. In both instances, she found numerous irregularities.
By letter dated June 9, 2008, respondent reported to the ODC that he had made “administrative errors” in submitting “inadequately documented” travel reimbursement requests to the firm. On June 10, 2008, Mr. Thompson, Ms. Simon, and Ms. Baumgartner notified the ODC of “travel expense reimbursement inconsistencies involving a number of Mr. Mitchell’s litigation files.”[2] In response to the partners’ complaints, respondent again suggested that he had simply neglected to provide adequate documentation for some of his expense reimbursement requests. He emphasized that he had actually incurred the expenses, however, and attributed his inadvertent “bookkeeping errors” to “submission delays” caused by the fact that he *310 had been submitting the reimbursement requests to the firm “weeks or months after he incurred the expenses,” rather than contemporaneously. On June 30, 2008, respondent resigned from the firm.
[.DISCIPLINARY PROCEEDINGS
In February 2011, the ODC filed formal charges against respondent, alleging that his conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation). The ODC subsequently amended the formal charges to allege that respondent’s conduct also violated Rule 1.5(a) (a lawyer shall not make an agreement for, charge, or collect an unreasonable amount for expenses) of the Rules of Professional Conduct. Respondent answered the formal charges, admitting some of the factual allegations but denying any misconduct. The matter then proceeded to a formal hearing on the merits.
During the hearing, respondent testified on his own behalf and on cross-examination by the ODC. He called no witnesses to testify before the committee. The ODC called respondent’s former law partners James Thompson, Fred Trowbridge, Kathleen Simon, and Adrianne Baumgartner. The ODC also introduced ten volumes of documentary evidence, including respondent’s calendar for the years 2003-2007 and the travel/expense reimbursement request forms he submitted to the firm during that time frame.
The ODC’s evidence was the subject of numerous and repeated evidentiary objections by respondent, all of which were overruled by the hearing committee chair. Respondent argued that most of the testimony of his former law partners was hearsay, was not based upon personal knowledge, or was improper opinion testimony. In addition, respondent objected to the ODC’s failure to introduce into evidence at the hearing the documentary evidence relied upon by the firm’s audit committee, including his billing records, all of his calendars, and the individual Farm Bureau files to which his travel expenses were charged.
| ^Finally, respondent raised a hearsay objection to the various notes written in the margins of the travel/expense reimbursement request forms introduced by the ODC. These notes were made by the partners who participated in conducting the audit of respondent’s expense practices, and reflect whether the partner who reviewed a particular reimbursement form could correlate the claimed expense with any information from respondent’s calendar, billing records, or the client’s file. If the expense in question was supported by the documentary evidence, it was marked “OK.” Expenses for which there was no supporting documentation were flagged with a shorthand notation indicating as much, including “NOC” (not on respondent’s calendar); “cont.” or “cancelled” (the matter was continued or cancelled and thus there was no need for travel); “moot” or “settled” (the matter had been settled or the motion was moot and thus there was no need for travel); “here” or “local” (the meeting, conference, or deposition was at the firm’s office in New Orleans and thus there was no need for travel); “Sat.” or “Sun.” (the event in question fell on a weekend and thus there was no need for travel); “tel. conf.” (the event or conference was handled by telephone and thus there was no need for travel); “DJM not attending” (respondent did not attend and another attorney with the firm covered the event and in certain instances submitted his or her own reimbursement requests and billed Farm Bureau for his or her time *311 for the event); or “DJM out” (respondent was out of the office, either on vacation or at a regularly scheduled event out of town, and thus could not have incurred the mileage charged).[3]
1 tHearing Committee Report
After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:
The formal charges relate to respondent’s requests for reimbursement of travel expenses in connection with professional services rendered on behalf of the firm’s client, Farm Bureau. There was no dispute that the expenses claimed by respondent were in fact reimbursed to him by the firm, and that the firm in turn billed these amounts to Farm Bureau as costs. Respondent admitted on cross-examination that some of his travel reimbursement requests were for “event[s] that never happened,” including travel to Jefferson Parish for a status conference that was actually conducted by telephone, and travel expenses/mileage at the government rate when in fact the event did not take place.
Respondent defended the formal charges both substantively (any mistakes in his expense reimbursement requests were the result of his sloppy or negligent recordkeeping) and procedurally (the ODC could not prove the formal charges without production of the original client files corresponding to his calendar and expense reimbursement requests). The committee rejected respondent’s procedural objections and found that the report of the internal audit performed by the firm’s partners pursuant to an executive committee directive was competent evidence, given that the members of the firm who conducted the audit and annotated the records with results of their review of all of the relevant source documents (including Farm Bureau’s corresponding client files) testified as to their part in the audit procedure. This testimony and the firm’s business records were more than sufficient to meet the ODC’s burden of producing clear and convincing evidence.
Turning to the merits, the committee noted that Mr. Thompson commissioned an executive committee to review respondent’s travel expense reimbursement requests upon finding a number of errors in the request for | ^reimbursement that respondent submitted in May 2008. This was not the first time that respondent’s expense reimbursement requests were called into question by the firm. Indeed, even respondent admitted that there was an earlier incident in the 1990’s which caused Mr. Thompson to require that respondent thereafter submit all of his travel reimbursement requests to another partner, Mr. Trowbridge, for review. Mr. Thompson also testified that he made it clear to respondent at that time that in no event was he ever to sign his own reimbursement checks, nevertheless, documentary evidence reveals that respondent did so on occasion.
*312 Mr. Thompson testified that after looking at respondent’s May 2008 expense reimbursement request, he pulled his expense requests for a larger period of time because he was concerned that what he had come across was more than just a random sloppy mistake. Once he conducted a more in-depth review, Mr. Thompson became more concerned and thought it prudent to discuss the problem with other members of the executive committee. They met and there was consensus as to the necessity of conducting a broader investigation. Having the records back to 2003, some of which had to be pulled from storage if they had not already been destroyed,[4] Mr. Thompson testified that the audit committee’s investigation was in actuality a three or four prong process, including review of respondent’s calendar, review of corresponding invoices and bills, and review of the corresponding individual client files. He further testified that the focus of the audit committee’s efforts was to correlate and validate each entry on respondent’s expense reimbursement request forms. Mr. Thompson testified that despite their best efforts, the audit committee unfortunately found that many of the expenses charged could not be supported.
|flThe committee found that Mr. Thompson credibly explained how, after the internal audit committee completed its assignment, respondent was so advised and given the opportunity to conduct his own review of all of the materials, including the client files, which were assembled in the firm’s conference room. Mr. Thompson’s testimony was corroborated in every significant particular by Mr. Trowbridge, Ms. Baum-gartner, and Ms. Simon, and therefore the committee rejected respondent’s suggestion that he did not have access to the files and had no idea that his expense reimbursement requests predating 2008 were at issue.
At the hearing, respondent confined his testimony to one category of the audit committee’s findings, specifically those entries flagged as “continued,” “cancelled,” “settled,” or “moot.” He testified that he had a specific recollection of actually attending some of these events notwithstanding that his calendar indicated the events had been continued, cancelled, settled, or mooted. At no time did respondent attempt to explain any of the 400 expense reimbursement requests which were not on his calendar (“NOC”). The committee noted that even over a period of five years, 400 events attended on a client’s behalf but not calendared is an incredibly large number, if not outrageously so. Another category not addressed by respondent was “DJM out,” indicating that he had charged travel expenses to a Farm Bureau file on a date on which his calendar showed that he was out of the office on vacation or for another personal matter. All of the out of town or out of the office periods noted on respondent’s calendar could have been independently verified by him even assuming arguendo that he was not allowed access to Farm Bureau’s files. Nevertheless, respondent chose not to investigate his own records which would have indicated whether he was in town or not. The committee concluded that respondent was clearly “out” for the periods indicated on his calendar and the charges for expenses on these dates were false. Finally, respondent failed to submit any *313 credible explanation for charges for travel hnexpenses to court proceedings on Sunday, July 13, 2004; Sunday, December 19, 2004; Saturday, December 2, 2006; Saturday, December 9, 2006; and Saturday, December 15, 2007. As these dates fell on a weekend, the committee concluded that respondent did not travel to any court proceedings on these dates.
The committee determined that by submitting hundreds of expense reimbursement requests for events not documented on his calendar, for weekend court dates, or for periods when he was out of the office, respondent violated Rules 1.5(a), 8.4(a), and 8.4(c) of the Rules of Professional Conduct. Respondent violated duties owed to his former client, Farm Bureau, and to the profession. He acted intentionally and caused harm to Farm Bureau and to the firm. There was also a potential for significant harm in the event that Farm Bureau had decided to terminate its relationship with the firm and pull all of its files, but fortunately that did not occur. The applicable baseline sanction in this matter is disbarment.
The committee did not discuss any mitigating factors. In aggravation, the committee noted respondent’s pattern of misconduct as well as his prior disciplinary record.[5]
Based on this reasoning, and relying on this court’s ruling in In re: Moser, 11-2790 (La.2/10/12), 81 So.3d 650,[6] the committee recommended that respondent be permanently disbarred.
Respondent objected to the hearing committee’s report and urged that this matter be remanded for a new hearing before a new hearing committee, on the ground that the committee’s findings and recommendation of permanent In disbarment rest entirely on evidence that was erroneously admitted in violation of the Code of Evidence, specifically: (1) the rule against hearsay; (2) the original-writing rule; (3) the requirement of personal knowledge; and (4) the rules regarding opinion testimony.

Disciplinary Board Recommendation

At the outset, the disciplinary board addressed respondent’s evidentiary objections and concluded they are largely without merit. Although disciplinary proceedings are subject to the provisions of the Code of Evidence, the code is not strictly applied because the court is the trier of fact in disciplinary cases. See Supreme Court Rule XIX, § 18(B); In re: Quaid, 94-1316, n. 2 (La.l 1/30/94), 646 So.2d 343, 348.[7] In its role as the trier of fact, the court “has the ability to consider the entire record and evaluate and weigh the probative value of evidence based on the totality of the circumstances.” In re: Stamps, 03-2985 at p. 17 (La.4/14/04), 874 So.2d 113, 123. As to each specific eviden- *314 tiary objection raised by respondent, the board stated as follows:
Hearsay: The board agreed with respondent that the margin notes on the audited expense reimbursement forms are out-of-court statements offered into evidence to prove the truth of the matter asserted, and therefore hearsay. La.Code Evid. art. 801. Hearsay is not admissible because it is unreliable evidence, but exceptions to the hearsay rule allow such evidence to be introduced “when there are indicia that the evidence is reliable.” See Buckbee v. United Gas Pipe Line Co., 561 So.2d 76, 87 (La.1990) (Watson, J., concurring in part and dissenting in part). The board also agreed that portions of the testimony at the hearing are hearsay; nevertheless, the board found the majority of the testimony is reliable and 112admissible, as what could not be authenticated by Mr. Thompson is corroborated through the testimony of Ms. Simon. She very credibly testified regarding her independent review of respondent’s expense reimbursement requests and the conclusion she drew thereafter that there were issues with “hundreds and hundreds of them.” For these reasons and because there is no need for a strict application of the Code of Evidence in disciplinary proceedings, the board found the committee did not err in admitting the testimony and documentary evidence into the record. The committee had the opportunity to evaluate the witnesses’ perceptions, memory, narrations, and sincerity and make credibility determinations as the eyes and ears of the court, which the board was not prepared to disregard. See In re: Bolton, 02-0257 (La.6/21/02), 820 So.2d 548.
Original Writing Rule: La.Code Evid. art. 1002 requires that in most circumstances an original writing must be produced in order to prove the content of the writing. Here, the committee determined that the witnesses testimony did not violate the original writing rule because it was not being offered to prove the actual contents of the source documents not admitted as evidence. Rather, the witnesses were called to testify about the reviews they conducted into the accuracy of respondent’s expense reporting and the knowledge gleaned from their reviews. Mr. Thompson and Mr. Trowbridge testified regarding their roles in the internal audit, while Ms. Baumgartner and Ms. Simon testified about their own independent reviews. Notably, all witnesses discovered that the source documents did not justify or substantiate respondent’s expense reimbursements in many instances. They also discovered various reimbursement checks made out to and signed by respondent without authorization and with no client file number or supporting documentation attached. Once again, the committee had the opportunity to evaluate the witnesses’ perceptions, memory, narrations, and sincerity and make credibility determinations accordingly. For these reasons and I,?,because there is no need for a strict application of the Code of Evidence in disciplinary proceedings, the board found the committee did not err in allowing the witnesses’ testimony.
Lack of Personal Knowledge: Respondent argues that the testimony of Mr. Thompson, Mr. Trowbridge, Ms. Simon, and Ms. Baumgartner was not based on personal knowledge, as required by La. Code Evid. art. 602, but was instead gained “through a second-hand review of documents plagued with hearsay and original-writing rule problems.” To the extent that Mr. Thompson and Mr. Trowbridge divided up respondent’s expense reporting, with each reviewing a specific period of time, and then compared their results to obtain “the big picture,” the board agreed that their testimony is not based upon *315 first-hand knowledge. Nevertheless, the board found the committee did not err in allowing this testimony, subject to respondent’s objection. The committee is not bound by the Code of Evidence but has a duty to receive all relevant evidence. The board evaluates and weighs the probative value of the evidence based on the totality of the circumstances, and the court has the opportunity on review to disregard any evidence that is inherently unreliable.
As to Ms. Simon and Ms. Baumgartner, the board found their testimony does meet the personal knowledge requirement. Personal knowledge is gained through first-hand observation or experience, not based on what someone else said. Here, Ms. Simon and Ms. Baumgartner clearly saw the source documents and gained personal knowledge through their first-hand observations. They did not rely upon Mr. Thompson’s margin notes or what other partners found during their internal audit. Moreover, their testimony was not offered in an attempt to prove whether the underlying events actually occurred but to establish that the witnesses had sufficient personal knowledge, based on their first-hand review, from which to conclude that the source documents did not justify or substantiate many of | ^respondent’s expense reimbursement requests. For these reasons, the board found that the testimony of Ms. Baumgartner and Ms. Simon was properly admitted by the committee.
Improper Opinion Testimony: Respondent argues that the testimony of his former law partners contains inadmissible opinion testimony. The board agreed that there are some instances in which the opinions expressed by Mr. Thompson and Mr. Trowbridge appear to have been influenced by the perception of others, but found the testimony of Ms. Baumgartner and Ms. Simon was not improper, as they testified regarding what they actually saw and observed when independently reviewing respondent’s expense reporting and comparing the various source documents. Accordingly, the opinions expressed by Ms. Baumgartner and Ms. Simon were rationally based on their perceptions, not those of fellow partners. Their testimony is not only relevant, but it is helpful to the determination of the fact in issue — whether respondent’s expense reimbursement requests can be justified or substantiated. Therefore, the committee did not err in allowing Ms. Baumgartner and Ms. Simon to give opinion testimony.
On the merits, the board determined that the hearing committee’s factual findings are supported by the record and are not manifestly erroneous, and that the committee correctly applied the Rules of Professional Conduct.
The board then determined that respondent knowingly and intentionally violated duties owed to his client and the legal profession.[8] His misconduct caused actual injury to his client, the firm, and the profession. Because respondent recklessly submitted hundreds of unsubstantiated expense forms, Farm Bureau was billed and required to pay over $23,000 in erroneous expenses, which the firm then had to refund. By failing to adhere to the high standards of conduct expected of 11fimembers of the bar, respondent tarnished the image of the legal profession.[9] *316 After considering the ABA’s Standards for Imposing Lawyer Sanctions, the board determined that the applicable baseline sanction is disbarment.
In aggravation, the board found the following factors: a prior disciplinary record, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law (admitted 1978). The board found that no mitigating factors are supported by the record.
Considering respondent’s misconduct in light of the permanent disbarment guidelines and the prior jurisprudence of this court, the board recommended he be permanently disbarred.[10]
Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Banks, 09-1212 (La.10/2/09), 18 So.3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.

Evidentiary Issues

At the outset, we note the majority of respondent’s arguments are based upon the admissibility of the evidence rather than a substantive defense on the merits of the formal charges. Essentially, respondent submits the evidentiary foundation of the ODC’s case is so deficient that this court may not reach the merits of the case.
In general, the Code of Evidence applies in disciplinary proceedings. Supreme Court Rule XIX, § 18(B). Nonetheless, we have repeatedly recognized that bar disciplinary proceedings are presented to this court in a unique posture stemming from our exclusive original jurisdiction over disciplinary proceedings against a member of the bar. La. Const, art. V, § 5(B). Such proceedings “are neither civil nor criminal but are sui generis.” Supreme Court Rule XIX, § 18(A); In re: Raspanti, 08-0954, p. 8 (La.3/17/09), 8 So.3d 526, 532.
Because of these considerations, we have held that the rules of evidence are not to be strictly applied in bar disciplinary cases. For example, in In re: Quaid, 94-1316, n. 2 (La.11/30/94), 646 So.2d 343, 348 we stated:
... We note, however, that the purpose of rules of evidence primarily intended to govern jury trials, particularly the hearsay rules, are less compelling in the context of imposing discipline on members of the legal profession. This Court retains power to determine the ultimate *317 question of admissibility under its original jurisdiction as the triers of fact in disciplinary proceedings, and it may well be more appropriate in disciplinary proceedings to be guided but not confined by strict application of the Code of Evidence. See In re Huddleston, 595 So.2d 1141, 1148 (La.1992) (concurring opinion). We observe that such an approach has been taken in other jurisdictions. See, e.g., In re Kennedy, 605 A.2d 600, 603 (D.C.App.1992); The Florida Bar v. Vannier, 498 So.2d 896, 898 (Fla.1986); 1 Werner v. State Bar, 24 Cal.2d 611, 150 P.2d 892, 893-94 (1944).
As explained in Quaid, disciplinary proceedings are guided by the Code of Evidence, but our unique constitutional role as triers of fact in these eases permits us to consider evidence which might otherwise be inadmissible. Applying this relaxed standard, we find the disciplinary board properly addressed respondent’s evidentia-ry objections.
Respondent’s primary objection is that the ODC violated the original writing rule found in La.Code Evid. art. 1002, which requires that in most circumstances an original writing must be produced in order to prove the content of the writing. We acknowledge the ODC did not produce copies of all the billing records and client files which were the basis of the witnesses’ testimony. Nonetheless, as the board observed, the witnesses’ testimony was not being offered to prove the actual contents of the source documents not admitted as evidence, but was instead related to the reviews the witnesses conducted into the accuracy of respondent’s expense reporting and the knowledge gleaned from their reviews. The witnesses were subject to cross-examination, and the committee had the opportunity to evaluate the witnesses’ credibility. Under these circumstances, we find there is no violation of the original writing rule.
Respondent also objects to the testimony of Mr. Thompson, Mr. Trow-bridge, Ms. Simon, and Ms. Baumgartner on the ground it was not based on personal knowledge, as required by La.Code Evid. art. 602. Because of the procedure the witnesses used to review the records, we agree that not all of their testimony was based upon first-hand knowledge. However, with regard to Ms. Simon and Ms. Baumgartner, these witnesses had personal knowledge through their first-hand observations, as they testified they did not rely upon Mr. Thompson’s margin notes or what other partners found during their internal audit. 11sMost importantly, the committee had an opportunity to see all witnesses and evaluate their credibility. We find this testimony is admissible.[11]
In summary, we find the testimony of respondent’s former law partners, which was found to be credible by the hearing committee, was properly admitted into evidence. Furthermore, the committee correctly received the documentary evidence introduced by the ODC. Accordingly, respondent’s evidentiary objections are overruled.

Merits

Having found the evidentiary foundation is proper, we now turn to a determination of whether the ODC has established by clear and convincing evidence that respondent submitted false expense reimbursement requests to his law *318 firm, which in turn charged the expenses to its client. A review of the evidence indicates the ODC established that respondent submitted hundreds of questionable and undocumented requests for expense reimbursement. Respondent failed to submit any credible explanation for these charges, some of which involved purported travel to court proceedings on weekends or holidays. Under these circumstances, we find no error in the committee’s factual finding that respondent violated the rules as charged.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Respondent violated duties owed to his client and the legal profession, resulting in actual harm to his client, the firm, and the profession. His conduct was both knowing and intentional. The applicable baseline sanction in this matter is disbarment.
Aggravating factors include a prior disciplinary record, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law (admitted 1978). There are no mitigating factors present.
In its report, both the hearing committee and the disciplinary board concluded that respondent’s offenses are so egregious that he should be permanently prohibited from applying for readmission to the bar. We agree.
Guideline 1 of the permanent disbarment guidelines set forth in Supreme Court Rule XIX, Appendix E suggests permanent disbarment is appropriate for repeated or multiple instances of intentional conversion of client funds with substantial harm. In the instant case, the record establishes that over a five-year period, respondent submitted nearly eight hundred requests for reimbursement of more than $23,000 in travel expenses which he falsely claimed to have incurred in the representation of his client. These expenses were reimbursed to him by the firm but then billed to the client as costs. This conduct caused actual harm to the client by wrongfully depriving it of funds. Additionally, respondent’s actions harmed the public’s perception of the entire legal profession.
Our jurisprudence has made it clear we do not impose permanent disbarment lightly. In re: Morphis, 01-2803 (La.12/4/02), 831 So.2d 934. Rather, permanent 1 ^disbarment is reserved for those cases where the attorney’s conduct convincingly demonstrates that he or she does not possess the requisite moral fitness to practice law in this state. In re: Petal, 10-0080 (La.3/26/10), 30 So.3d 728; In re: Muhammad, 08-2769 (La.3/4/09), 3 So.3d 458.
In the case at bar, the sheer number of charges and the length of time over which the charges occurred lead to the inescapable conclusion that respondent entered into a knowing and calculated scheme to wrongfully deprive his client of funds. These facts reveal respondent’s clear disregard for the welfare of his client and for *319 his duties as an attorney. As such, we find the facts convincingly demonstrate respondent lacks the moral fitness necessary to practice law in Louisiana.
Accordingly, we will adopt the board’s recommendation and permanently disbar respondent.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of David J. Mitchell, Louisiana Bar Roll number 9692, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
WEIMER, Justice, concurs in part and dissents in part and assigns reasons.
HUGHES, Justice, dissents for the reasons assigned by Justice WEIMER.

. In May, July, September, and November 2007, respondent wrote and signed checks totaling $1,851 payable to himself which had no supporting documentation and had not been assigned to any particular client file. Furthermore, in the same time frame, respondent wrote and signed a $256 check payable to himself which appears to have been assigned to a client file; however, the original check and the carbon copy of the check have different file numbers written on them.

. These complaints were filed against respondent pursuant to the partners' reporting obligation under Rule 8.3(a) of the Rules of Professional Conduct.

. As one example, the Louisiana Association of Defense Counsel (LADC) holds its winter conference each year in Beaver Creek, Colorado during the week of Mardi Gras, and respondent testified that he attended the conference nearly every year. In the year 2006, Mardi Gras fell on Tuesday, February 28, 2006. Respondent's 2006 calendar specifically indicated that he was leaving on Saturday, February 25th to go "out of town,” presumably to attend the LADC conference, and that he was "returning” on Saturday, March 4th. Nevertheless, respondent submitted an expense reimbursement request for travel on Monday, February 27, 2006 to the 40th JDC for the Parish of St. John the Baptist and another for travel on Tuesday, February 28, 2006 to the 29th JDC for the Parish of St. Charles (when the courts in St. Charles Parish would have been closed even if respondent did not attend the LADC conference).

. There was no dispute concerning the firm's record retention policy. After a case was closed, the paper file was maintained in a storage facility for a three-year period, then destroyed. Mr. Thompson testified that once die erroneous expenses charged to Farm Bureau were discovered, lie put a hold on the destruction of any of Farm Bureau's files that had been assigned to respondent.

. Following respondent’s guilty plea in federal court to one misdemeanor count of failure to file income tax returns, this court accepted a petition for consent discipline and suspended respondent from the practice of law for one year and one day, fully deferred, subject to a two-year period of probation with conditions. In re: Mitchell, 96-2182 (La. 10/4/96), 681 So.2d 339.

. The respondent in Moser engaged in several instances of "pre-billing” her clients for work she had not yet completed, all while on probation for engaging in similar misconduct at another law firm. After the ODC completed its investigation, Ms. Moser and the ODC submitted a joint petition for consent discipline to this court, seeking the imposition of permanent disbarment. This court accepted the petition for consent discipline and permanently disbarred Ms. Moser.

.In Quaid, this court commented that given its original jurisdiction as the trier of fact in a disciplinary proceeding, "it may well be more appropriate ... to be guided but not confined by strict application of the Code of Evidence.”

. Respondent clearly knew his conduct was sloppy, subpar, and derelict, yet he continued to engage in it, even after a previous warning from the firm. If nothing else, respondent’s conduct demonstrates a pattern of intentionally reckless expense reporting that resulted in actual harm.

. While the actual damage is quantifiable, the board felt it important to note that respondent’s conduct potentially could have caused *316 immeasurable injury to the law firm and its members had Farm Bureau decided to terminate the firm’s representation and take its business elsewhere.

. Specifically, the board cited Guideline 1 of the permanent disbarment guidelines, which suggests that permanent disbarment may be warranted in cases involving “repeated or multiple instances of intentional conversion of client funds with substantial harm.”

. In a similar vein, respondent asserts the opinions expressed by the witnesses could have been influenced by the perceptions of others. However, the board found the testimony of Ms. Baumgartner and Ms. Simon was not improper, as it was rationally based on their perceptions, not those of fellow partners. We see no error in this conclusion.