# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #050

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **18th day of October, 2017**, are as follows:

**PER CURIAM**:

2017-B -0453     IN RE: ADAM ANTHONY ABDALLA

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Adam Anthony Abdalla, Louisiana Bar Roll number 30370, be and he hereby is disbarred, retroactive to October 22, 2014, the date of his interim suspension.  His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked.  All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

HUGHES, J., dissents for the reasons given by Crichton,J.
CRICHTON, J., dissents and assigns reasons.
GENOVESE, J., dissents for the reasons assigned by Justice Crichton.

SUPREME COURT OF LOUISIANA

NO. 2017-B-0453

IN RE: ADAM ANTHONY ABDALLA

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Adam Anthony Abdalla, an attorney licensed to practice law in Louisiana but currently on interim suspension pursuant to a joint petition filed by the parties in October 2014. *In re: Abdalla*, 14-2142 (La. 10/22/14), 149 So. 3d 1222.

**UNDERLYING FACTS**

Respondent was formerly employed by the Lafayette law firm of Andrus, Boudreaux, Landry & Coussan (the "firm"). In September 2014, the ODC received a complaint alleging that respondent had converted funds from the firm. Specifically, the complaint alleged the following facts, to which the parties herein have stipulated:

1. Respondent wrote three unauthorized checks to himself out of the client escrow account. The checks were made payable to Orange Ocean, LLC, a single member LLC with respondent listed as the sole member, in the amounts of $5,125, $2,500, and $5,000. These funds were being held in escrow as part of a commercial transaction on behalf of a client.

2. Respondent wrote two unauthorized checks to himself out of the client escrow account. The checks were made payable to Abdalla Enterprises, LLC, a single

member LLC with respondent listed as the sole member, in the amounts of $2,000 and $800. These funds were held in escrow pursuant to an Escrow Agreement, signed by respondent, which stated that the firm would be compensated $2,500 by the client for its services. Although fees were due to the firm, no checks were made payable to the firm.

3. Respondent wrote an unauthorized check to Belle Realty of Lafayette, LLC ("Belle") in the amount of $5,910.86 from the firm's operating account, an account on which he never had signing authority. Belle is a commercial real estate company owed by respondent's parents. Respondent claimed the check was for rent payable to Belle and written on behalf of a firm client, and that the firm would be reimbursed by the client through a corresponding invoice. Respondent never billed any client for the corresponding amount paid to Belle.

4. A client wrote a $1,000 check to "Adam – Boudreaux" as a retainer for legal services. Respondent endorsed the check and deposited it into his personal account. Respondent never tendered these funds to the firm, and the firm continued to provide legal services to the client.

5. Respondent created fraudulent invoices on fictitious firm letterhead for two clients for legal services rendered. One client paid respondent $11,500 by check made payable to respondent.[1] Respondent never tendered these funds to the firm, and the firm continued to provide legal services to the client.

6. Respondent performed legal services for three clients, including formation of corporate entities and drafting of resolutions, and instructed the clients to pay him cash directly for those services. The clients paid respondent cash in the total amount of $1,250. Respondent never tendered these funds to the firm.

---

[1] The stipulation does not indicate the amount of funds paid to respondent by the second client.

2

7. A client, Blanc Bridal, LLC, paid respondent in cash for legal services rendered through the firm. Respondent created a $3,500 invoice, which he then voided. The firm did not receive the funds for the legal work performed by respondent.

8. A client, Corey Devan Willis, paid respondent $500 in cash for legal services. Respondent marked a $500 invoice to Mr. Willis as paid in full, but he never turned over these funds to the firm.

## DISCIPLINARY PROCEEDINGS

In September 2015, the ODC filed formal charges against respondent, alleging that his conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation).

Respondent answered the formal charges, admitting his misconduct and requesting a hearing in mitigation. He also pointed out that he had reimbursed the firm for all the funds he had converted, as well as the expenses incurred by the firm for attorney's fees and accounting costs.

### Mitigation Hearing

The hearing committee conducted the mitigation hearing in July 2016. Prior to the hearing, the parties entered into a joint stipulation of facts. The joint stipulation included the parties' stipulations concerning the specific allegations of misconduct included in the formal charges, as set forth above, as well as the following additional stipulations:

3

1. Respondent has admitted taking the funds and has reimbursed the firm for all funds that he has converted that are known to the firm.

2. All funds were taken from the firm and none were taken from individual clients.

3. Respondent stole the money to support a drug habit as he routinely used hydrocodone and is addicted to same.[2]

4. Respondent voluntarily enrolled in Palmetto Addiction Recovery Center for a ninety-day rehabilitation program after the complaint was filed with the ODC.

5. Respondent successfully completed the ninety-day program and enrolled in the Judges and Lawyers Assistance Program ("JLAP") after completing his treatment. Further, respondent entered into a five-year contract with JLAP.

6. There are no criminal charges pending against respondent.

7. Respondent's misconduct violates Rules 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct.

8. Respondent's actions harmed the firm, the public, and the legal profession.

9. The aggravating factors present in this matter include a pattern of misconduct and multiple offenses.

10. The mitigating factors present in this matter include the absence of a prior disciplinary record, personal or emotional problems, timely good faith effort to make restitution or to rectify the consequences of the misconduct, full and free disclosure to the disciplinary board or a cooperative attitude toward the proceedings, and remorse.

The ODC called no witnesses to testify at the hearing. Respondent testified on his own behalf and on cross-examination by the ODC. Respondent called the

---

[2] The original stipulation was to the effect that respondent's drug of choice was hydrocodone; however, the evidence at the hearing established and the parties agreed that the drug was actually Oxycontin.

following witnesses to testify in person before the hearing committee: Joseph E. "Buddy" Stockwell, III, the Executive Director of JLAP; his wife, Stephanie Abdalla; Jay Weiss, M.D., the medical director of Palmetto Addiction Recovery Center; his lifelong friends Jacques Landry, Charles "Buck" Miciotto, James Bayard, and Michael Fenstermaker; and his sister, Alicia Abdalla Mouton.[3]

Mr. Stockwell testified to respondent's participation in the JLAP program and his current sobriety. Dr. Weiss testified that respondent presented to Palmetto with a severe opioid addiction and a moderate use disorder related to Adderall. He testified that after working through withdrawal symptoms, respondent spent approximately three months at his facility, and, by all indications, was a successful patient who has maintained his sobriety since.

Respondent's longtime friends all testified to his good character. Respondent's wife testified to his character and his ongoing recovery process. Respondent's sister testified to the behavior she saw in her brother in the course of his addiction and how his life has changed in the recovery process.

In his own testimony, respondent explained that he graduated from law school in 2006 and immediately got a job with a law firm in Lafayette handling business transactions and loan closings. He made a lateral move to the firm in July 2012. In December 2012, respondent was experiencing back pain. He took some Percocet that he had left over after an earlier surgery on his hand, and although he had taken pain pills before, this time it "had a different effect on [him]" that he described as "euphoric." Soon, he began taking the Percocet more frequently, and then every day, and after a while he was purchasing Oxycontin on the street and taking five to seven pills a day.

---

[3] Prior to the hearing, respondent listed four additional family members as witnesses. In lieu of cumulative testimony, those witnesses did not testify at the hearing, and the parties stipulated that the testimony they would have given would be consistent with that of respondent's friends and family members who had already testified.

5

Respondent admitted that he took money from the firm to support his drug habit. This occurred from November 2012 to sometime in 2014. In August 2014, the firm terminated respondent, apparently suspicious about the financial activity in his files. The firm hired a CPA to perform a forensic accounting and respondent eventually paid back all the money that was missing, approximately $39,000.[4] In June 2015, after an intervention by family and friends, respondent went to Palmetto for inpatient treatment.[5] He was diagnosed with opioid use disorder, severe; stimulant use disorder, moderate (relating to his use of Adderall for attention deficit disorder); and opioid withdrawal. Respondent successfully completed the treatment program at Palmetto and signed a five-year JLAP agreement on September 15, 2015 that incorporated all of the discharge recommendations made by Palmetto.[6] Respondent testified that he is currently in compliance with all of the requirements of his JLAP agreement. He is no longer taking Adderall and has no desire to use opioids. Respondent testified that in light of what he learned in treatment, he feels "pretty confident" that he can stay sober for the rest of his life.

*Hearing Committee Report*

After considering the testimony and evidence presented at the hearing, as well as the stipulations entered into by the parties, the hearing committee found that respondent knowingly and intentionally violated the Rules of Professional Conduct as charged in the formal charges. He violated duties owed to the legal system, to his

---

[4] Respondent and his wife used their savings to repay some of these funds and borrowed the remainder from his parents and his sister. He testified that he has agreed to repay his family for the sums they loaned to him.

[5] Respondent testified that he delayed in seeking treatment after he was fired in August 2014 because his wife was three months pregnant at the time, and because he thought he could kick his substance abuse problem on his own. However, he also testified that he continued using Oxycontin until June 2015, when he was admitted to Palmetto.

[6] With the exception of a single-page discharge letter from Dr. Weiss, the records of respondent's treatment at Palmetto were not submitted into evidence at the hearing.

firm, and to the profession. The applicable baseline sanction in this matter is disbarment.

Respondent's principal contention is that there should be a downward deviation from the baseline sanction because he suffered from a mental condition during the time of the misconduct. The committee acknowledged that respondent developed a severe opioid addiction in late 2012, at the age of 32. Prior to this time, he had no substance abuse problems or addiction problems, and he was respected for his character, integrity, and professional skills. He entered a recovery program at Palmetto in June 2015 and has been sober since that time. While addiction recovery is a "day by day" process, all of the evidence suggests that respondent has a high likelihood of maintaining his sobriety. His treatment at Palmetto was specifically focused on professionals returning to work, and through the JLAP program, he has on-demand access to high-quality treatment options. Respondent has the support of friends and family to help him, and he is well equipped with the tools needed to manage his sobriety moving forward. Though at the peak of his addiction he was consuming shockingly high doses of opioids, it did not appear to the committee that the specter of his prior addiction, if managed properly, presents a significant danger to the public or the profession.

Nevertheless, the committee concluded that the thefts committed by respondent were executed knowingly, over an extended period of time, and with significant planning and forethought. The first theft occurred in November 2012. The thefts continued through the spring of 2014, during which respondent stole a total of $39,085.86 in eleven separate acts. It was respondent's specific business and professional knowledge and skill that allowed him to commit these thefts and, for a time, conceal them from his employer and clients.

For the mitigating factor of mental disability to be applicable, Standard 9.32(i) of the ABA's *Standards for Imposing Lawyer Sanctions* provides that

7

respondent must prove by clear and convincing evidence that his chemical dependency caused the misconduct.[7] The committee found that here, respondent did not present sufficient evidence to show direct causation between his chemical dependency and his misconduct. Although some friends and family testified that respondent was a different man during his addiction, and not someone who would be expected to steal under normal circumstances, respondent did not present expert testimony that his disability was the cause of the misconduct. Though he may have used the money taken to support his addiction, that fact is not necessarily proof that the addiction caused his misconduct. Respondent knew what he was doing was wrong and he used various sophisticated methods to accomplish his criminal acts over an extended period. His repeated and deliberate actions during this time "belie his contention that his misconduct was an aberration." *See In re: Stoller*, 04-2758 (La. 5/24/05), 902 So. 2d 981.

The committee concluded:

> Respondent has been cooperative with the disciplinary process, proactive in his recovery, and seems to be on the right track for getting his life straight. However, given the severity of his misconduct, … those action[s] are not sufficient to justify a downward deviation from the baseline sanction of disbarment.

---

[7] Specifically, respondent must prove four factors under ABA Standard 9.32(i):

> (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
> (2) the chemical dependency or mental disability caused the misconduct;
> (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
> (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

The commentary to Standard 9.32 emphasizes the "careful analysis" that is required in considering issues of mental disability offered as mitigating factors in disciplinary proceedings, and that "direct causation between the disability" and the misconduct must be established. The commentary further discusses the weight to be assigned to this factor, indicating that "the greatest weight" should be assigned when the disability is the sole cause of the offense. If the disability is the principal cause of the offense, it should be given "very great weight"; if it is a substantial contributing cause of the offense, it should be given "great weight." In all other cases in which the disability is considered as mitigating, the commentary indicates it should be given "little weight."

Based on this reasoning, the committee recommended that respondent be disbarred.

Respondent objected to the hearing committee's report. He asserted that the committee erred in finding that he did not present sufficient evidence to show a causal connection between his chemical dependency and his misconduct. He also objected to the sanction recommended by the committee.

*Disciplinary Board Recommendation*

The parties stipulated to the facts regarding the underlying misconduct, and respondent stipulated that he violated the Rules of Professional Conduct as charged in the formal charges. The disciplinary board accepted these stipulations.

By writing unauthorized checks out of firm accounts, creating fraudulent and fictitious invoices, and directing firm clients to pay him personally, respondent knowingly and intentionally violated duties owed to the legal system, the legal profession, and the public. Respondent stipulated that his actions harmed the public, the firm, and the legal profession. No clients were harmed as a result of respondent's conduct, as his theft involved his firm's money and not any client funds. The baseline sanction for respondent's misconduct is disbarment.

The parties stipulated to the following aggravating factors: a pattern of misconduct and multiple offenses. The board also recognized the additional aggravating factors of a dishonest or selfish motive and illegal conduct. The parties stipulated to the following mitigating factors: the absence of a prior disciplinary record, personal or emotional problems, timely good faith effort to make restitution or to rectify the consequences of the misconduct, full and free disclosure to the disciplinary board or a cooperative attitude toward the proceedings, and remorse.

In addition, respondent challenges the committee's conclusion that the evidence was not sufficient to prove a causal connection between his misconduct

and his chemical dependency. In its brief to the board, the ODC acknowledged that expert evidence of a causal connection was presented at the hearing.[8] The board accepted this stipulation, and found the committee erred in its determination that respondent did not prove the mitigating factor of mental disability.[9] Nevertheless, the weight to be given to this factor depends upon whether the addiction was the sole, principal, or a substantial contributing cause of the misconduct, and here the record testimony was not specific enough for that distinction to be made. Furthermore, there was evidence of other financial issues that could have contributed to the misconduct, as well as evidence that the first act of misconduct occurred before the addiction became full blown. But, even assuming "very great weight" should be given to the addiction as a mitigating factor, the board agreed with the committee that the aggravating factors carry as much weight as the mitigating factors and that a downward deviation from the baseline sanction of disbarment is not warranted.

For various forms of theft from law firms, the court has imposed sanctions ranging from a three-year suspension to permanent disbarment. *See In re: Kelly*, 98-0368 (La. 6/5/98), 713 So. 2d 458 (three-year suspension imposed upon a lawyer who converted approximately $80,000 in funds belonging to his law firm; significant mitigating factors present); *In re: Bernstein*, 07-1049 (La. 10/16/07), 966 So. 2d 537 (while a partner in two law firms, the lawyer created "off the books" billing statements and collected fees from clients for legal services totaling approximately $30,000 which he then converted to his own use; disbarment imposed); *In re: Sharp*,

---

[8] Dr. Weiss testified that he "blame[d] the drugs" for respondent's "bad behavior" in his law firm and opined that such conduct "is unlikely to recur if [respondent] stays off the drugs."

[9] Regarding the four factors of ABA Standard 9.32(i), the board found that (1) respondent's opioid addiction was established by the testimony of Dr. Weiss and by stipulation; (2) the testimony of Dr. Weiss, along with the testimony of respondent's family and friends, established a causal connection between respondent's chemical dependency and his misconduct; (3) respondent's enrollment in JLAP, completion of a ninety-day treatment program, and continued sobriety since June 2015 demonstrate a meaningful and sustained period of successful rehabilitation; and (4) Dr. Weiss and Mr. Stockwell felt positive about respondent's continued recovery.

09-0207 (La. 6/26/09), 16 So. 3d 343 (disbarment for lawyer's conversion of $50,000 in attorney's fees and expenses due to his law firm upon settlement of a personal injury matter); *In re: Pearson*, 12-0940 (La. 10/16/12), 100 So. 3d 313 (lawyer converted $133,000 belonging to his law firm and improperly used the firm's credit card for personal expenses; disbarment imposed); *In re: Mitchell*, 13-2688 (La. 5/7/14), 145 So. 3d 305 (lawyer permanently disbarred for submitting hundreds of false expense reimbursement requests to his law firm, which in turn charged the expenses to its client). Here, while respondent's misconduct appears to be most similar to that in *Kelly*, the board found that under the circumstances, a three-year suspension is unduly lenient. First, as in *Kelly*, the scale of respondent's theft from his law firm was significant – he stole nearly $40,000 over a long period of time until he was caught. Second, respondent perpetrated the theft by sophisticated and deliberate means, including creating fraudulent invoices, which is similar to the misconduct in *Bernstein*. Third, respondent delayed nine months in seeking treatment for his addiction. He was fired in August 2014 and consented to interim suspension in October 2014 but did not enter treatment at Palmetto until June 2015. Respondent's apparent reluctance to seek treatment for his addiction, at least initially, was a concern to the board and resulted in a shorter period of proven sobriety on which to rely. Fourth, and most significant, the first theft from the firm occurred in November 2012. However, respondent testified that the pain pills did not have a different, pleasurable effect on him until the end of December 2012, suggesting that the first act of misconduct predates full blown addiction.

Based upon these facts, the board found that a downward deviation from the baseline sanction is not warranted, and recommended that respondent be disbarred.

Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

11

## DISCUSSION

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

Respondent converted at least $39,085.86 from his law firm. The funds were taken in eleven separate acts committed by respondent over a period of approximately eighteen months, and involved writing unauthorized checks out of firm accounts, creating fraudulent and fictitious invoices, and directing firm clients to pay him personally. Respondent has stipulated to this misconduct and to his violation of Rules 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct. Therefore, the sole issue to be decided by this court is the appropriate measure of discipline to be imposed.

In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

There is no dispute that the applicable baseline sanction in this matter is disbarment. There is likewise no dispute that the aggravating and mitigating factors

found by the disciplinary board are supported by the record. Rather, respondent takes issue only with the board's assessment of the weight to be assigned to the mitigating factors – particularly his addiction – in relation to the aggravating factors.

We agree with the board's analysis in this regard. While respondent did offer evidence of a causal connection between his addiction and the misconduct, the weight to be given to this mitigating factor depends upon the extent to which the addiction contributed to the misconduct, and that determination cannot be made from the record before the court. Moreover, respondent admitted that he first converted funds from his law firm before he became addicted to Oxycontin. Nevertheless, even assuming that "very great weight" is assigned to respondent's addiction as a mitigating factor, we agree with the board that the aggravating factors carry as much weight as the mitigating factors and that a downward deviation from the baseline sanction of disbarment is not warranted.

We would be remiss if we did not acknowledge the positive steps respondent has taken which have helped him greatly personally and which will be to his advantage if he reapplies for admission in the future. However, the conduct warrants disbarment.

Based on this reasoning, we will adopt the disciplinary board's recommendation and disbar respondent, retroactive to the date of his interim suspension.

**DECREE**

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Adam Anthony Abdalla, Louisiana Bar Roll number 30370, be and he hereby is disbarred, retroactive to October 22, 2014, the date of his interim suspension. His name shall be stricken from the roll of attorneys and his license to

13

practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

**SUPREME COURT OF LOUISIANA**

**No. 2017-B-453**

**IN RE: ADAM ANTHONY ABDALLA**

**ATTORNEY DISCIPLINARY PROCEEDINGS**

**Hughes, J., dissents for the reasons given by Crichton, J.**

# SUPREME COURT OF LOUISIANA

# NO. 2017-B-0453

# IN RE: ADAM ANTHONY ABDALLA

# ATTORNEY DISCIPLINARY PROCEEDING

**CRICHTON, J., dissents and assigns reasons**

I respectfully dissent from the Court's decision to impose disbarment in this matter, as I find the sanction unduly harsh.[1]  In my view, respondent is entitled to a downward departure from the baseline sanction of disbarment, and I would impose a three-year full suspension with no time deferred.

The evidence before this Court supports the fact that respondent has a serious opioid addiction, and he continues his long road to recovery to this day.  The majority concludes that respondent's addiction was not "full blown" until December 2012, and therefore respondent failed to prove his first act of conversion in November 2012, was caused by his addiction.  I do not find that a mere month between respondent's first act of conversion (in November) and the time that the drugs started to have a "different effect" on him (in December) is sufficient to negate a connection between the two.

Even assuming respondent did fail to make the necessary link between his addiction and his misconduct, I find the majority inappropriately disregards the mitigating factors in this case.  This Court has long held that "[t]he discipline to be

---

[1] Every disciplinary case is fact-specific, and this Court has previously imposed lighter sanctions with which I have strongly disagreed.  *See In re: Stacy Lynn Morris*, 17-0526 (La. 5/19/17), 219 So.3d 1064 (Crichton, J., dissenting from the Court's suspension of respondent for conversion of client funds, and would impose disbarment); *In re: Edward Bissau Mendy*, 16-0456 (La. 10/19/16), 217 So.3d 260 (Crichton, J., dissenting from the Court's disbarment of respondent for conversion of client funds, and would impose permanent disbarment); *In re: Southall*, 14-2441 (La. 3/17/15), 165 So.3d 894 (Crichton, J., concurring in part and dissenting in part from the Court's suspension of respondent for conversion of client funds, and would disbar respondent).

imposed depends upon the facts of each case and the seriousness of the offense(s) involved, considered in light of any aggravating and mitigating circumstances." *Louisiana State Bar Ass'n v. Reis*, 513 So.2d 1173, 1178 (La. 1987), citing *Louisiana State Bar Ass'n v. Bosworth*, 481So.2d 567 (La. 1986). Respondent's misconduct in this case is serious, as he converted almost $40,000 from his law firm to satisfy his drug addiction. However, not only has respondent made full restitution of every dollar of that amount (to his firm, as no funds were converted from any individual clients), he has willingly agreed to and so far fully complied with a five-year JLAP agreement. Respondent also spent three months in an in-patient substance abuse program, and while his recovery is far from over, he has consistently maintained his sobriety since leaving the program. The record also reflects that respondent has been fully cooperative with the disciplinary investigation since his interim suspension three years ago, and has not faced any criminal charges. Importantly, it appears that even if respondent had done nothing to mitigate his circumstances here, the Court would still have imposed disbarment. This fact alone represents the importance of mitigating circumstances in cases such as these.

I further find the majority's comparison and contrast of this case to *In re: Kelly,* 98-0368 (La. 6/5/98), 713 So.2d 458, curious, where the majority notes there were "significant mitigating factors" in *Kelly*. This Court found in *Kelly* that, despite a conversion of funds of twice the amount as respondent here ($80,000) from his firm, respondent in *Kelly* was entitled to a downward departure from the baseline sanction of disbarment due to respondent's "mental condition" of depression, triggered by a bitter divorce and chemical dependency. The *Kelly* court concluded:

> The baseline sanction for conversion is disbarment. Nonetheless, we recognize there are several mitigating factors in this case, including respondent's mental condition at the time of the conversion, his lack of any prior disciplinary record, his acknowledgment of the wrongful nature of his actions, his cooperation in the disciplinary investigation and his prompt payment of full restitution. Additionally, while we do not minimize the seriousness of respondent's conduct, we note that his

2

actions did not cause harm to any clients, and that several of his law partners (the victims of respondent's misconduct) testified in favor of a more lenient sanction. Considering all these factors, we conclude the appropriate sanction for respondent's misconduct is a three-year suspension from the practice of law.

*Kelly, supra*, at 461 (internal citation omitted).[2]

In my view, the majority finds distinctions without differences between *Kelly* and respondent here, as the mitigating factors in the case before us today do not appear much different from those outlined in *Kelly*. Addiction is no different than any other disease, including depression, a fact the majority appears to have declined to consider.

For the above-stated reasons, I would depart downward from the baseline sanction of disbarment, and impose a full three-year suspension with no time deferred.

---

[2] The hearing committee in *Kelly* noted the following specific mitigating factors:

> (1) personal and financial problems which contributed to his depression and impaired his behavior; (2) restitution; (3) lack of criminal prosecution; (4) the misappropriation involved his law firm, rather than clients; (5) lack of prior disciplinary record; (6) full and free disclosure to the disciplinary board; and (7) remorsefulness. Based on these factors, the committee recommended respondent be suspended from the practice of law for a period of one year and one day, followed by two years of supervised probation subject to certain conditions.

*Id.* at 460.

SUPREME COURT OF LOUISIANA

NO. 2017-B-0453

IN RE: ADAM ANTHONY ABDALLA

ATTORNEY DISCIPLINARY PROCEEDING


**GENOVESE, J.,** dissents for the reasons assigned by Justice Crichton.